FILED
ASHEVILLE, N.C.
DEC 28 2020
U.S. DISTRICT COURT
W. DIST. OF N.C.

original

In the
United States District Court
for the Western District of North Carolina
Asheville Division

L. Dean Gibson,
Plaintiff
V.
Giles Chemical Corporation,
Defendant

Ca. No: 1:20 cv 394

Memorandum of Points and Law in Support of Plaintiff's pleading pursuant to Title VII of the Civil Rights Act of 1964

II.
Introduction

Now comes: L. Dean Gibson, referred to hereinafter as "Plaintiff" and/or "The Plaintiff" by and through Pro se, and respectfully submits this Memorandum of Points and Law in support of Plaintiff's pleading pursuant to Title VII of the Civil Rights Act of 1964.

III.
This Court has subject matter jurisdiction pursuant to Title 28 U.S.C. §1331
Title 28 U.S.C. §1331 provides that:

> "The district courts shall have original jurisdictions of all civil actions arising under the Constitution of the United States."

Id.
It is also submitted that the Plaintiff in the instant case has fulfilled the requirements of Title VII that required The Plaintiff to exhaust the administrative remedy requirements by presenting the issues herein and below to the Defendant and the EEOC (referring to the Equal Employment Opportunity Commission. See, e.g., Fort Ben County v. Davis, 2019 U.S. Lexis 3891, at *1 (finding that the requirement to first file a lawsuit with the EEOC before bringing such into the court is a statutory condition precedent); and also in the case of Syndor v. Fairfax Cty., 681 F.3d 591 (finding that charges must first be filed with the EEOC).

Claims*

1. Plaintiff was a victim of racial harassment and racial discrimination due to shift coordinator/supervisor's repeated use of the word "nigger" when referencing Plaintiff and other African Americans during work hours at Giles Chemical Corporation.
2. Plaintiff was a victim of racial discrimination when shift supervisor forced co-worker with attendance issues, poor work ethic, admitted drug addiction, the tendency to make sexually suggestive comments, and the inability to perform many assigned tasks to work on the production line directed by the African American Plaintiff in the sentence case while allowing every production line directed by white machine operators to reject above referenced co-worker and his aforementioned issues.
3. Plaintiff was a victim of sexual harassment due to supervisor's refusal to discipline or terminate co-worker after clear and indisputable evidence became known to supervisor that plaintiff's co-worker did in fact engage in sexual harassment at workplace.
4. Supervisor, while ensuring the safety of his white line operators, compromised the safety of his lone African American operator (Plaintiff in the instant case) by forcing the Plaintiff to operate complex machinery and endure the actions and distractions caused by a co-worker who admittedly was working directly for and with plaintiff under the influence of marijuana and methamphetamine and thus causing plaintiff to have to work harder and perform more tasks that his fellow white operators.
5. Plaintiff was wrongly suspended for allegedly threatening a person with disabilities as a result of lies advanced by a supervisor and Quality Assurance Employee to Human Resources and for which Human Resources failed to interview alleged person with disabilities before suspending Plaintiff because alleged person with disabilities would have confirmed that no such threats were ever made.
(Note: Go to argument #6 before asterisk note)
*All claims submitted above allege a violation of Plaintiff's rights pursuant to Title VII of the Civil Rights Act of 1964.
6. Evidence in the totality clearly shows that Plaintiff was victimized by a hostile work environment plagued with racial discrimination, racial harassment, sexual harassment, preferential treatment for white machine line operators and unsafe working conditions as a result of supervisors allowing co-workers to work under the influence of drugs and alcohol.

## Summary of the Case

Plaintiff is an African American male formally employed by the Defendant (Giles Chemical Corporation and referred to hereinafter as "Giles").

Giles is a component of Premier Magnesia, a global market giant and leaders in magnesia-based products providing a wide range and variety of applications ranging from agriculture, industrial and environment markets.

Premier Magnesia as a company is involved in the mining and production of Magnesium Oxide (MgO) products that are sold directly to its many customers and are used as a primary raw material for other divisions of the company. One of the divisions of the company in particular is Giles Chemical, the Defendant in the instant case.

It is submitted that the corporate offices of Premier Magnesia are headquartered in Waynesville, North Carolina.

Plaintiff began his employment with Premier Magnesia (Giles) on July 8, 2016 where he started at the entry level of an Operator B at the company's repack division located in Waynesville, North Carolina.

Plaintiff's work record should be considered exemplary considering that from the time he started his employment and for the 17 straight months thereafter he never called in sick, had perfect attendance, was never late and never received a write-up as a result of violating any of the company's rules and policies detailed within the company's handbook that is issued to every person employed by Giles.

It is also submitted that the Plaintiff received an award in the form of a $500 paid bonus for his exemplary work record and as detailed above for those achievements for the first 6 months of his employment.

Throughout his employment at Giles, the Plaintiff had to endure what can be defined as a hostile work environment. Indeed, Plaintiff was subjected to racial slurs by both co-workers and a shift coordinator/supervisor.

Plaintiff submits a video of co-worker Joey Blalock actually spelling out and saying the word "nigger" while inside of Giles and on the work floor. Exhibit #1, Flash Drive Item/Line #0.

Plaintiff also had to endure the use of the word "nigger" by a shift coordinator/supervisor by the name of Austin Burnette who commanded fellow employees to refer to him as "Bambi."

Please note that "Austin Burnette" and "Bambi" are the same person throughout this pleading and the two different names in reference to the same person will be used interchangeably.

The Plaintiff, African American co-workers Joshua Jackson and Nekeisha Smith, Caucasian Co-workers Neil Snyder and John Jenkins, are witnesses to Austin Burnette's use of the word "nigger" in referencing African Americans and cell phone recordings pursuant to N.C. Gen. Stat. Ann. §15A-287 (West 2012), Title 18 U.S.C. §2511(2)(d), sworn affidavits and Facebook Messenger messages to corroborate claims by the Plaintiff.

In addition to the already racially hostile work environment at Giles, the Plaintiff had to endure the unorthodox and unprofessional shenanigans of primary supervisor Alan Ledford who boldly accommodated his white line machine operators with the luxuries of discretion that was nearly unfettered, able-bodied subordinates with good work ethics and attendance records, safer work areas free from admitted drug users and abusers and a work environment free from racial and sexual harassment. The Plaintiff in the instant case was not afforded these luxuries as the only African American line machine operator.

Indeed, supervisor Alan Ledford knowing that Plaintiff's co-worker Neil Anthony Snyder had chalked up complaints for making sexually suggestive comments to Plaintiff (and later admitted and apologized for doing so) and groping co-workers. See, e.g. Exhibit #2, Flash Drive Item/Line #5, recorded conversation between Plaintiff and co-worker Tony Haney proving that Haney complained to Alan Ledford of being groped by Neil.

Knowing that Neil was an admitted drug user and abuser and often showed up to work under the influence of drugs, supervisor Alan Ledford forced Plaintiff who spent 17 years in

prison for drugs and on Federal Supervised Release at the time to accept Neil on his assigned line. See, e.g., United States v. Gibson, 1:97 CR 310.

In a narrative controlling email with just a drop of truth from Alan Ledford to Kay Arnold (H.R.) and Monte Plott (Repack Manager) and dated Friday, November 16, 2019 at 6:18 a.m., Alan correctly noted that the Plaintiff "didn't want around Neil cause of Neil's FG and him was on drugs and he just got cleared from [sic] his PO and he wasn't going back to jail." Exhibit #20.

Because Neil was an admitted user and abuser of methamphetamine and marijuana, working with Neil was both a stigmatizing and traumatizing experience throughout the working relationship which Alan Ledford and Austin "Bambi" Burnette would not remedy. Plaintiff worked in constant fear of Neil either overdosing at work or dropping drugs on the floor for which either case would command Plaintiff being treated as a suspect and being thoroughly investigated due to his past history of being convicted of drug distribution. Plaintiff even endured nightmares of having to return to prison because of drugs found in his work area and for which did not belong to him. Plaintiff endured these nightmares often while being forced to work with Neil. See, e.g., sworn affidavit of Emily Plott, Exhibit #4.

As a result of all the foregoing facts, the workplace became overwhelmingly hostile due to supervisors' refusal to intervene that the Plaintiff was forced to discharge by resigning his position with Giles on January 4, 2019.

The above referenced resignation was born out of a wrongful suspension as a result of being falsely accused of threatening a person with disabilities with termination. Something that even person with disabilities (Neil Snyder) said never happened.

## Arguments

1. Plaintiff was a victim of racial harassment and racial discrimination due to shift coordinator's/Shift supervisor's repeated use of the word "nigger" when referencing Plaintiff and other Africans during work hours at Giles Chemical Corporation.

The question before The Court is whether a shift coordinator in the capacity of a shift supervisor and his repeated use of the word "nigger" when referencing Plaintiff and other African American employees during work hours violate the rights of African Americans under Title VII of the Civil Rights Act of 1964?

Plaintiff's answer to the question submitted above is a qualified "yes."

There is no question that the week of Monday, November 26, 2018 through Thursday, November 29, 2018 that Austin "Bambi" Burnette was functioning in the capacity of a supervisor and he also enjoyed functioning in the same capacity on the night of January 3, 2019 until the morning of January 4, 2019 (Thursday evening until Friday morning, second shift).

The Supreme Court has identified those functioning in the capacity of a supervisor as being individuals whose actions could give rise to vicarious employer liability. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

The term supervisor for the purposes of imposing vicarious liability on an employer under Title VII of the Civil Rights Act of 1964 only if the employee is empowered by the

employer to take tangible employment actions against the victim. Vance v. Ball State University, No. 11-556 (June 24, 2013).

The Vance Court defined "supervisory" authority to include having the power to make "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."
Id.

As emphatically stated by Alan Ledford, Monte Plott (Repack Manager), Daniel Justice (Repack Superintendent) and Austin "Bambi" Burnette himself, Burnette had the authority to terminate Plaintiff's employment with Giles.

Sometime during the week of November 26, 2019 through November 29, 2018 and while primary supervisor was away, Austin Burnette in the capacity of the Second Shift Supervisor blurted out the word "nigger" in the presence of three African American Giles employees in the company's Repack Division. The African American employees witnessing Austin "Bambi" Burnette's use of this racial slur were Plaintiff, former employees Joshua Jackson and Nekeisha Smith.

Plaintiff will submit proof of Burnette's use of the racial slur with sworn affidavits, Facebook Messenger messages, a recorded conversation between Plaintiff and Joshua Jackson. See, e.g., Exhibit #3 Flash Drive line/item #3. (Plaintiff and Jackson acknowledging Burnette's use of the racial slur and their still existing disenchantment with Burnette using the racial slur in their presence). See also Facebook Messenger message acknowledging Burnette's use of racial slur (nigger). Exhibit #3, line/item #3.

The second incident and for which the Plaintiff can prove that Austin "Bambi" Burnette used the racial slur "nigger" occurred on the night of January 3, 2019 during an audit/quality check ordered by the Quality Assurance Department.

This audit/quality check came about due to the Plaintiff being ordered by a training supervisor to remove the air from the pouches of the Epsom salt filling and sealing process to facilitate the packing process for a packer admittedly under the influence of drugs.

Removing the air as instructed caused the Epsom salt to appear hard and not acceptable for shipping to customers. For that reason Quality Assurance ordered a quality check on the packaged salt that had made its way to several pallets. Plaintiff and his crew were directed to salvage the packages of salt that contained the minimal amount of air while discarding those failing quality.

The co-worker having problems packing the salt and for which the Plaintiff as the operator was ordered to remove the air from the filling and sealing process was Operator B Neil Snyder.

Neil Snyder admitted to having trouble packing the Epsom salt and attributed his difficulty to doing so to him crashing down off methamphetamine and told the Plaintiff that he needed some to bring him back up. After making this statement he asked Plaintiff if he could go home to get himself together. Plaintiff responded by telling him that he was no supervisor and only a supervisor could give him permission to leave.

Neil sought permission to leave from the supervisor. Indeed, Neil informed the Plaintiff that "Bambi" said that he could go home and get himself together.

Neil returned back to work later in the night admittedly high on methamphetamine but still smelling of the odor of marijuana.

While still going through pallets of defective pouches of salt Neil was being loud and obnoxious and started talking about his sexual preferences and how he liked sleeping with men and women and even made sexually suggestive comments.

Plaintiff, and exercising patience with Neil respectfully asked Neil to calm down and focus on the work we had to complete.

Knowing that Neil was high on meth, Plaintiff told Neil that working high and not focusing on the job could make him a liability. After stating this to Neil in a calm professional manner, Neil became paranoid and started asking people if was a liability or could be fired for losing focus at work.

Plaintiff asked Austin "Bambi" Burnette if he could send Neil home or to another line due to Neil admitting being high. Burnette denied Plaintiff's request by stating that no other operator would take him and that he was aware of Neil's condition.

Later, while still checking for defective bags of salt and while performing this task from the roller conveyor belt, Plaintiff overheard Neil ask supervisor Burnette if the defective bags were his fault. Burnette said, "no, that fucking stupid nigger done this." In a recorded telephone conversation with Neil Snyder, he without any level of coercion stated that he heard Austin "Bambi" Burnette refer to Plaintiff as "that freaking nigger" as it relates to the defective bags of salt. See, e.g., June 19, 2019 telephone conversation between Plaintiff and Neil Snyder, Exhibit 17, **Line/Item #_22_**(Flash Drive).

After all and as previously stated, Neil was standing there when "Bambi" uttered the aforementioned racial slur.

Immediately after "Bambi" uttered the racial slur (nigger), Plaintiff became overwhelmed with anger. However, Plaintiff thought about how much progress he had made after serving 17 years in Federal Prison and being released from Federal Supervised release two years earlier than he was scheduled to be released by his United States Probation Officers (Sara Wright and higher ups). All for exemplary conduct while on supervised release.

Avoiding what could have been an ugly scene and display of workplace violence the Plaintiff confronted Burnette and demanded that he report incident to Ms. Kay Arnold and that he was going to call her and discuss the incident with her himself. Burnette promised that he would do so this time as he did not report eh first incident that involved Plaintiff, Joshua Jackson, and Nekeisha Smith and use of the world "nigger" to Alan Ledford as he promised he would do.

On the morning of January 4, 2019 while at home awaiting for Ms. Kay Arnold to arrive at her office in the Human Resources Department, Ms. Arnold called the Plaintiff at his residence and informed him that he was suspended for threatening a person with disabilities with termination and refused to hear Plaintiff's claims of ethnic intimidation, racial discrimination, racial harassment and sexual harassment.

The suspension Plaintiff received was nothing less than Austin "Bambi" Burnette beating him to the punch in an effort to downplay his conduct that undisputedly amounted to conduct unbecoming of a supervisor. Not to mention conspiring with co-workers to advance a lie that Plaintiff was threatening Neil, a person with disabilities, with termination.

The two incidents detailed above where Austin "Bambi" Burnette used the word "nigger" in the presence of Plaintiff and other African Americans and on specific incident where he referred to Plaintiff as a "nigger" in the presence of witness Neil Snyder constitutes what is defined as a hostile work environment.

The Fourth Circuit United States Court of Appeals, the court that reviews cases from this court has stated that racial slurs, especially those made by someone with some level of supervisory authority are so damaging to the recipient, that even one or two instances can create an objectively severe and hostile working environment. See, e.g., Boyer-Libereto v. Fontainebleau Corps., No. 13-1473 (4th Circuit. May 7, 2015).

A judgement of $250,000 for mental anguish is sought as a result of Plaintiff having to endure a racially hostile work environment caused by the actions of a racist supervisor (Austin "Bambi" Burnette), $40,000 per year from January 4,2019 until the resolution of this case for lost wages or yearly average salary from original hire date until resolution of the instant case. Appointment of counsel and a jury trial is also sought.

2. Plaintiff was a victim of racial discrimination when Shift supervisor forced co-worker with attendance issues, poor work ethic, an admitted drug addiction, the tendency to make sexually suggestive comments and the ability to perform many assigned tasks to work on production line directed by the African American plaintiff in the instant case while allow every production line directed by Caucasian (white) machine operators to reject above-reference co-worker and his aforementioned

The real question before the court is whether the Plaintiff in the instant case was a victim of racial discrimination in the workplace when supervisors forced a problematic worker under the influence of methamphetamine on the production line of a lone African American operator after giving four white operators unbridled discretion to reject drug abusing and problematic worker? Plaintiff submits that the answer to this question is also a qualified "yes."

Out of seven machine operators at Giles Chemical Corporation the Plaintiff in the instant case was the only African American operator. The remaining six operators were white.

Around September or October of 2018 (if not earlier) Giles hired a male whom they described as a person with disabilities. The name of this person with alleged disabilities was a Caucasian male by the name of Neil Snyder.

Neil was a high-functioning employee who could perform entry level tasks such as stacking pallets with cases of Epsom Salt. He was able to perform this task as an Operator B. However, when it came to packing the Epsom Salt Neil would struggle somewhat. This was an observation made by Plaintiff long before Neil was forced on Plaintiff's machine and production.

Putting Neil on the machines and production lines run by the white operators proved unproductive. Nearly all of the white operators at Giles expressed the concern about a loss in production due to Neil's inability to concentrate or focus on the job demands in a sustained manner. This is one of the reasons the white operators pressed supervisor Alan Ledford to remove Neil from their machines and lines.

Neil, even before being forced on Plaintiff's machine and line, attributed methamphetamine and ADHD to his inability to perform tasks or keep up with co-workers assigned on lines.

Due to his admitted drug addiction and diagnosed condition, Neil was also unreliable. Indeed, there were long stretches of weeks where Neil could not harness the energy to work the entire forty-eight hour weekly scheduled work week. He would leave work early and thus causing a supervisor, co-worker or an operator to fill in.

In addition to the above-referenced issues with Neil, there were issues of him groping co-workers and constantly making sexually suggestive remark to or in the presence of co-workers.

After the white operators expressed their anger and discontent as it related to Neil and requested that Neil be moved off of their lines, Supervisor Alan Ledford accommodated the white operator by forcing him on the line run by the African American operator, the Plaintiff, and over the Plaintiff's objection. Supervisor Alan Ledford immediately asserted his authority by stating that he makes the decisions and that Neil was going to work on Plaintiff's line whether Plaintiff liked it or not.

Instantly, supervisor Alan Ledford let it be known that the Plaintiff, the lone African American operator, would not be afforded the persuasive prowess afforded to his fellow machine operators via white privilege.

It is submitted that the Plaintiff did not want to work with Neil initially as Neil, who admitted to being under the influence of drugs while at work, was a liability to not only to the health and safety to himself and others, but to Plaintiff's federal supervised release as supervised by the United States Probation Office and the positive post-conviction rehabilitative efforts that were being made by the Plaintiff.

Giles knew that the Plaintiff was on probation/supervised release and gave valid reasons for not wanting to work with an employee who was breaking the law by possessing and using Schedule I and II drugs.

As confirmed by Neil himself, Neil was evicted from a homeless shelter for possession of marijuana the same day Plaintiff resigned from Giles (January 4, 2019), see, e.g. recorded conversation between Plaintiff and Neil Snyder, Exhibit # _22_ Line/Item # _22_. The name of the homeless shelter is Pathways and is located in Waynesville, North Carolina.

In closing it is submitted that supervisor Alan Ledford and Austin "Bambi" Burnette subjected the Plaintiff to a stressful and toxic work environment by requiring the Plaintiff to babysit an out of control co-worker with a known drug addiction that caused the Plaintiff to have to assume two different job titles (Operator A and Operator B). Indeed, when Neil could not perform the job that he was assigned to do for one reason or another or was granted to leave work early countless times the African American operator (Plaintiff) had to by order take up Neil's slack and perform the jobs and tasks reserved for Neil as commanded by his job title.

No white operators were forced to do their job in addition to Neil's.

The sum of $150,000 for racial discrimination and creation of a hostile work environment is sought.

3. Plaintiff was a victim of sexual harassment to due to supervisor's refusal to discipline or terminate co-worker after clear and indisputable evidence became known to supervisor that Plaintiff's co-worker did in fact engage in sexual harassment at work place.

In a recorded conversation between the Plaintiff, Exhibit #__16__, Line/Item #__16__ (Flash Drive) and co-worker Tony Haney, Tony expressed his discontent with being grouped by Neil Snyder and the refusal of supervisor Alan Ledford to intervene and remedy the situation. Instead, Supervisor Ledford downplayed Neil's groping of Tony by responding, "Ah, he just looks up to you." Id.

The Plaintiff witnessed Neil Snyder grope Tony Haney by squeezing his pectorals or chest on several occasions at Giles Chemical Corporation.

The Plaintiff, as required by Page 19 of the Giles Employee Handbook, reported Neil's sexually suggestive comments made to him to Alan Ledford on two occasions in which supervisor Alan Ledford responded, "I'll look into it" or "I'll talk to Neil."

Neil later apologized for his constant sexually suggestive comments after admitting that he made them. See, e.g., Exhibit #16, Line/Item #16 (Flash Drive).

In light of evidence presented above, it is thus indisputable that supervisor Alan Ledford's and Austin "Bambi" Burnette's negligence in giving Neil a free pass to sexually harass Plaintiff and another co-worker caused Plaintiff to not only be harassed sexually but subjected him to a hostile work environment.

A sum of $250,000 is sought as result of the sexual harassment and exposure to both a toxic and hostile work environment.

4. Supervisor, while ensuring the safety of his white line operators compromised the safety of his lone African American line operator by forcing the Plaintiff to operate complex machinery and endure the actions and distractions caused by a co-worker who was admittedly working directly for and with Plaintiff under the influence of marijuana and methamphetamine and thus causing Plaintiff to have to work harder and perform more tasks than his fellow white operators.

Workplace safety is compromised when an employee by way of its managerial or supervisory departments allow its employees to work while under the influence of marijuana and methamphetamine. Such a practice put their employees at risk for injury or death due to mistakes or poor decision making by someone high on drugs.

Neil Snyder, a Giles employee and former co-worker of the Plaintiff who often admitted to being under the influence of drugs and working with Plaintiff while high could have been dubbed the most dangerous man at Giles.

Knowing that Neil was a threat to their and their co-workers' safety, the white operators succeeded in keeping Neil away from their machines and production lines.

Second Shift Supervisor Alan Ledford and Repack Manager Monte Plott saw fit to make its lone African American machine operator the sacrificial lamb by forcing Neil with his safety concerns and risks onto the machine and line of the Plaintiff on a permanent basis.

By allowing Neil to work under the influence of drugs creating serious safety concerns and risks, Alan Ledford and Monte Plott made a bold statement by placing Neil on the African American's machine and line (Plaintiff). Indeed, a statement functionally equivalent to saying, "We are going to put the African American Operator at risk or in grave danger while protecting our white machine operators when it comes to safety concerns and risks."

As stated before, Neil admitted to being under the influence of marijuana and meth the entire time he worked alongside Plaintiff. He even went on social media stating how long he has been sober which overlaps to the time he had worked with Plaintiff and proves that he was using said drugs while working alongside Plaintiff and up until Plaintiff's resignation from Giles on January 4, 2019. See, e.g., Exhibit #7, Line/Item #7 (Flash Drive).

A sum of $150,000 is sought.

5. Plaintiff was wrongly suspended for allegedly threatening a person with disabilities as a result of lies advanced by a supervisor and Quality Assurance Employee to Human Resources and for which Human Resources failed to interview alleged person with disabilities before suspending Plaintiff because alleged person with disabilities would have confirmed that no such threats were ever made.

On the morning of January 4, 2019 the Plaintiff received a call via telephone from Human Resources Director Kay Arnold informing him that his employment has been suspended pending an investigation into Plaintiff allegedly threatening a person with disabilities with termination. It was also clearly stated that until said investigation was concluded that Plaintiff is to not be on the property of or around Giles for any reason.

Plaintiff contends that the charge of threatening a person with disabilities and for which he was being investigated was patently frivolous from the word "go" because the alleged person with disabilities and for which Plaintiff allegedly threatened with termination was co-worker Neil Snyder.

In a recorded video encounter between the Plaintiff and Neil Snyder discussing the issue Neil stated that Plaintiff never threatened him in any way. Exhibit # 18, Line/Item # 18 (Flash Drive). Neil went on to say that the Plaintiff was the only one that would show him how to do anything (working at Giles). This video also depicts Neil saying that he was paranoid and attributes his extreme paranoia to "meth." Id.

The report that Plaintiff was threatening a person with disabilities (Neil Snyder) stemmed from a report from Anita H. Lopez of the Quality Assurance Department wherein Ms. Lopez intentionally withheld facts relating to the January 3, 2019 involving Plaintiff and Neil Snyder, lied about statements and/or remarks allegedly made by the Plaintiff and since she wanted to swear herself in as an investigator or agent for law enforcement, failed to interview the Plaintiff for his side of the story or his version of the events. This report by Ms. Lopez was written on January 3, 2019.

It is submitted that had Ms. Lopez inquired about the issues with Neil the Plaintiff would have informed her that since Neil informed him (the Plaintiff) that he was high on meth, the Plaintiff, as the lead operator of the machine and was entrusted with the safe operation of the machine and the safety of the crew working under him, the Plaintiff correctly informed Neil that

he working under the influence of methamphetamine and expressing an inability to focus on the job and assigned tasks makes him a liability.

To reinforce Plaintiff's defense with a reiteration of the facts, Neil Snyder confessed to being high and coming down off of meth. See, e.g., Video, Exhibit #18.

Austin "Bambi" Burnette's Friday, January 4, 2019, 2:21AM email to Monte Plott; Daniel Justice; Alan Ledford; Kay Arnold and Jen Grabo also mentions Neil Snyder's paranoia field concerns about his inability to focus and correctly being a liability. However, Burnette, as evidenced by the body of the email never sought to investigate and receive the Plaintiff's side of the story or his version of the events. See, e.g., Exhibit #21.

It is submitted that in a display of the utmost level or racial bias for their fellow white co-worker Neil Snyder, neither Anita Lopez nor "Austin Bambi" did not want to hear the African American Plaintiff's side of the story.

In closing, neither Ms. Lopez nor Mr. Burnette stated within their reports that the Plaintiff himself threatened to terminate Neil Snyder. Id.

The charge of threatening a person with disabilities with termination by HR Kay Arnold and for which was the basis of the Plaintiff's suspension was bogus and proves that a suspension was unwarranted. At no time, even throughout the EEOC process, no evidence surfaced that Neil Snyder was even interviewed to confirm and substantiate the charge by Ms. Arnold of HR. Apparently Ms. Arnold just simply wanted to become a willing participant in the gang up on and get rid of the African American fiasco.

Had Ms. Arnold interviewed Neil Snyder before meeting out a suspension to the Plaintiff, the Plaintiff is confident that he would still be working at Giles but in another department.

A sum of $150,000 is sought.

6. Evidence in the totality clearly shows that Plaintiff was victimized by a hostile work environment plagued with racial discrimination, racial harassment, preferential treatment for white machine line operators and unsafe working conditions as a result of supervisors allowing co-workers to work under the influence of alcohol and sexual harassment.

Without arguing any points the Plaintiff simply asks that should this court find that the evidence presented about and in totality violates his civil rights within the meaning of Title VII that he should be awarded $250,000 in damages or whatever is agreed upon in a settlement process.

## Conclusion

In light of all the foregoing the Plaintiff asks that this court award him the relief sought in each of the arguments presented above or an amount agreed upon by the settlement process.

Respectfully Submitted by _____, the Plaintiff on this 22 day of December, 2020.　　L, D, Gibson

# CERTIFICATE OF SERVICE

I, L. Dean Gibson (Louis D. Gibson), the Plaintiff instant case, certified that I mailed a copy of the instant Memorandum with the original to the U.S. District Court Clerk and requesting that copy be mailed to Giles Chemical Corporation at 372 Smathers ~~Commerce~~ St., Waynesville, N.C. 28786.

Certified on the 22nd day of December, 2020 By:

*L. Dean Gibson* (signature)

L. Dean Gibson